**SEARS, ROEBUCK & COMPANY, Plaintiff,**

v.

**SEARS plc and Sears Financial Services Limited, Defendants.**

**Civ. A. No. 88–342–JLL.**

United States District Court, D. Delaware.

July 24, 1990.

See also 744 F.Supp. 1289.

---

Arthur G. Connolly, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, Del. (James A. Drobile of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and Nancy Schaefer of Schaefer, Rosenwein & Fleming, Chicago, Ill., of counsel), for plaintiff.

Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del. (Shelby R. Grubbs of Grant, Konvalinka & Grubbs,

P.C., Chattanooga, Tenn., of counsel), for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. BACKGROUND

Sears, Roebuck and Company ("Roebuck") filed this trademark and trade name infringement suit on June 28, 1988, Docket Item ("D.I.") 1, against Sears plc ("PLC"), a company incorporated under English and Welsh law. Roebuck amended its complaint on March 10, 1989, and added Sears Financial Services Limited ("SFSL") as a defendant. Discovery closed on December 15, 1989. Currently before the Court are PLC's motions to dismiss for lack of personal jurisdiction, D.I. 204, PLC's motion for summary judgment, D.I. 222, and Roebuck's motion for partial summary judgment, D.I. 220.[1]

## II. FACTS

This is not the first legal confrontation concerning the use of the name "Sears" between these two corporate groups. In 1985, PLC changed the name of a Tennessee corporation from "Edgar Pickering, Inc." to "Sears, Inc." D.I. 48 at ¶ 19. The new "Sears, Inc." was to be a holding company for other American corporations. (*Id.*) "Sears, Inc." changed its name to E.P. Securities Inc., in response to a complaint filed by Roebuck. That complaint was subsequently dismissed with prejudice and without any admission of liability.

E.P. Securities, Inc., however, never acquired any stock. Instead, for tax reasons, PLC incorporated a new corporation in January 1986 in Delaware. D.I. 238 at 11. PLC named this new corporation "Sears, Inc."

The new "Sears Inc." was intended to be a holding company of other American corporations. *Id.* at ¶ 20. In response to a complaint filed by Roebuck, "Sears, Inc." of Delaware changed its name to Delaware Mercantile Holdings, Inc. ("DMH"). Roe-

buck's complaint was subsequently dismissed without admission of liability and with prejudice. As part of the settlement, DMH agreed that neither it, nor any of its subsidiaries, would use the name "Sears." *See* D.I. 238 at 5.

The use of the word "Sears" in the names of subsidiaries is part of PLC corporate policy. As the chairman of PLC related:

Sears is the family name of the group, and it's a perfectly natural thing to form companies for trading purposes ... but much more pertinent was that companies on the shelf, what we call dormant companies, when required for use in a holding situation, should be called Sears. That's our name.

There are many examples of *us changing the names* of dormant companies to Sears companies, such as Sears Travel.

D.I. 238A at A39 (emphasis added). PLC's overall policy concerning its relationship with its subsidiaries is relatively "hands off."

Sears PLC does, however, have direct and indirect subsidiaries. Those subsidiaries are generally entitled, as subsidiaries, to identify their parent or ultimate parent company, namely Sears plc. Moreover, they are, in certain filings within the United Kingdom, required to note their relationship with Sears plc. Otherwise, while Sears plc has the ability to prevent a subsidiary from using the "Sears" name, in practice it would not do so.

Further, on a practical level, Sears plc is not able to "control" the everyday activities of its subsidiaries (indeed, it is hard to see how any company of its size and standing could do so) and it has made no effort to do so.

*Id.* at 28–29. As a practical matter, it is apparent that while PLC fosters the use of the name "Sears" by its subsidiaries, PLC does not become deeply involved with the day-to-day affairs of the corporations it owns.

---

1. PLC concedes that service of process has been effectuated under the Hague Convention. *See* D.I. 280. SFSL's motion to dismiss for lack of personal jurisdiction and for summary judgment will be addressed in a separate opinion.

DMH is owned by PLC and three of PLC's wholly owned subsidiaries. D.I. 238 at 12.[2] Three of DMH's four directors are also directors of PLC. D.I. 238A at 171–75. Roebuck contends that DMH is a mere shell. The record Roebuck compiled in discovery, however, shows that DMH is a functioning holding company. During the relevant time period, DMH directly owned SUSA Mercantile Corporation and two other holding companies, Butler Investments, Inc. and Sears USA Investments Corporation. D.I. 238A at A185. From 1986 through 1989, DMH's investments in subsidiary companies totaled over $160 million. *See* D.I. 238A at A427–45. DMH's board of directors authorized the purchase of its three immediate subsidiaries, D.I. 238A at A7; issued stock, *id.* at A9; opened its own bank account, *id.* at A12, A22; changed the name to "Delaware Mercantile Holdings, Inc." from "Sears, Inc.," D.I. 238A at A14; reviewed and approved its balance sheets, *e.g., id.* at A15, A16; reviewed and approved corporate actions, resignations and appointments, *e.g., id.* at A17; authorized discovery searches for litigation, *id.* at A19; approved settlement agreements, *id.* at A20; approved repayment of treasury stock, *id.* at A24; authorized the sale of a subsidiary, *id.* at A25; and elected its own directors.

Roebuck contends that DMH's subsidiaries bypassed DMH and reported directly to PLC. The evidence cited by Roebuck does not support this contention, however. The affidavits relied on by Roebuck only indicate that DMH did not submit its own report consolidating the activities of its subsidiaries. *See, e.g.,* D.I. 238A at 216–17. DMH, however, did not exercise its power as owner of all outstanding shares of its subsidiaries' stock to elect its subsidiaries' directors. *See* D.I. 238A at 196–200.

Finally, PLC has also authorized the sale of unsponsored American Depositary Receipts ("ADRs"). *See* D.I. 238 at 10. ADRs, representing depositary shares, are issued by United States banks against securities of foreign corporations which those banks hold as depositaries. United States investors use ADRs as a substitute for trading the foreign security itself. *See Consolidated Gold Fields PLC v. Minerco, S.A.,* 871 F.2d 252, 255 (2d Cir.1989); 17 C.F.R. § 230.405 (1990) (definition of depositary share); *Annual Review of Federal Securities Regulation,* 39 Bus.Lawyer 1105, 1108–09 (May 1984); Royston, *The Regulation of American Depositary Receipts: Americanization of the International Markets,* 10 N.C.J. Int'l L. & Com. Reg. 87, 87 (1985). An unsponsored ADR program is one in which the foreign issuer neither promotes the trading of the ADRs in this country, nor makes the necessary filings with the SEC. *See, e.g., Consolidated Gold Fields, PLC v. Anglo American Corp. of South Africa Limited,* 698 F.Supp. 487, 494 (S.D.N.Y.1988); Lorenz, *EEC Law and Other Problems in Applying the SEC Proposal on Multinational Offerings to the U.K.,* 21 Bus.Lawyer 795, 801 n. 42 & accompanying text (1987). The entire program, except for the foreign issuer's supplying of basic financial information, is administered by the United States depositary. As one commentator has noted, "ADRs are unique instruments in that the Depositary does not necessarily act for or as an agent of the foreign corporation ... whose stock is deposited against the issuance of ADRs." Moxley, *The ADR: An Instrument of International Finance and a Tool of Arbitrage,* 8 Vill.L.Rev. 19, 33 (1962).

PLC ADRs became available in 1984, after the Irving Trust Company had approached PLC the year before. Currently, Citibank and The Bank of New York are United States depositaries for PLC stock and issue ADRs on an unsponsored basis. The ADRs are traded under the name "Sears" and the share prices are listed in the Wall Street Journal. Because the ADRs are available over-the-counter, they are available in Delaware. There is no evidence in the record that a Delaware resident has ever owned a PLC ADR.

---

**2.** These subsidiaries are: Sears Securities plc, Sears Investment Limited and SH Services Limited. (D.I. 238A at A–169.)

## III. PERSONAL JURISDICTION

Rule 4 of the Federal Rules of Civil Procedure permits assertion of personal jurisdiction over an out-of-state party pursuant to the law of the state in which a District Court sits. *See* Fed.R.Civ.P. 4(e). Thus, the personal jurisdictional analysis is comprised of two parts. The Court must first determine whether the forum's long-arm statute applies. If the long-arm statute does apply, the Court must determine whether assertion of personal jurisdiction over the defendant would comport with due process. *See Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *United States v. Consolidated Rail Corp. ("Conrail"),* 674 F.Supp. 138, 142 (D.Del.1987); *Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1315 (D.Del.1987); *Dentsply International, Inc. v. Pentron Corp.,* 648 F.Supp. 856, 858 (D.Del.1986); *Afros S.p.A. v. Krauss–Maffei Corp.,* 624 F.Supp. 464, 466 (D.Del.1985); *Moore v. Little Grant Indus., Inc.,* 513 F.Supp. 1043, 1046 (D.Del. 1981), *aff'd,* 681 F.2d 807 (3d Cir.1982); *LaNuova D & B, S.p.A. v. Bowe Co., Inc.,* 513 A.2d 764, 768 (Del.1986); *Waters v. Deutz Corp.,* 479 A.2d 273, 274 (Del.1984).

### A. *The Long–Arm of Delaware*

Roebuck, as plaintiff, has the burden of showing the existence of personal jurisdiction. *See Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982); *Harmon v. Eudaily,* 407 A.2d 232, 233 (Del.Super.1979), *aff'd,* 420 A.2d 1175 (Del.1980); *Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1244 (Del. Super.1987); *Finkbiner v. Mullins,* 532 A.2d 609, 612 (Del.Super.1987); *see also Chalek v. Klein,* 193 Ill.App.3d 767, 140 Ill.Dec. 760, 764, 550 N.E.2d 645, 649 (1990); *Reeves v. Baltimore & Ohio R.R. Co.,* 171 Ill.App.3d 1021, 122 Ill.Dec. 145, 147, 526 N.E.2d 404, 406 (1988).[3]

The set procedure for establishing personal jurisdiction under a long-arm statute, such as Delaware's, is: First, if the jurisdictional challenge occurs prior to discovery, the plaintiff must make a prima facie showing, in the allegations of the complaint, that jurisdiction exists. If the jurisdictional issue is raised after discovery, the plaintiff must allege specific facts supporting its position. This may be accomplished through the pleadings, affidavits and discovered materials in the record. Second, the defendant may contest jurisdiction by submitting affidavits of its own. Finally, an evidentiary hearing may be held at the request of a party, or in the discretion of the Court.[4] If no evidentiary hearing is held, the plaintiff has met its burden if it has established a prima facie case when the record is viewed in the light most favorable to the plaintiff. When addressing the personal jurisdiction after discovery has been completed, however, it is appropriate to review and evaluate the entire record. The Court need not be blind to discovered materials, and should look beyond the facade of the pleadings. *See, e.g., Ball v. Metallurgie Hoboken–Overpelt, SA,* 902 F.2d 194 (2d Cir.1990); *Serras v. First Tennessee Bank National Association,* 875 F.2d 1212 (6th Cir.1989); *Morris v. SSE, Inc.,* 843 F.2d 489 (11th Cir.1988); *see also Dentsply Intern Inc. v. Pentron Corp.,* 648 F.Supp. 856 (D.Del.1986) (reserving decision on personal jurisdiction, pending an evidentiary hearing, because of disputed factual allegations); *Greenly v. Davis,* 486 A.2d 669 (Del.1984) (approving trial court's discounting of plaintiff's general and unsupported affidavits); *Plummer,* 533 A.2d at 1245 (prima facie case should be evaluated in light of the pleadings and affidavits); *Mandalay Associates Limited Partnership v. Hoffman,* 141 Ill. App.3d 891, 96 Ill.Dec. 225, 228, 491 N.E.2d 39, 42 (1986); *2A Moore's Federal Practice* ¶ 12.07[2.–2].

---

**3.** Delaware courts have traditionally relied on interpretations of the Illinois Long–Arm Statute because Delaware modeled its law after that of Illinois. *See, e.g., Plummer,* 533 A.2d at 1246 (citing cases).

**4.** Neither party requested an evidentiary hearing in this matter.

Roebuck contends that either of two subsections of Delaware's long-arm statute applies:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, ... who in person or through an agent:
>
> ....
>
> (3) Causes tortious injury in the State by an act or omission in this State;
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

10 *Del.C.* § 3104. PLC contends that personal jurisdiction is lacking under the Delaware law, and that in any event, the exercise of personal jurisdiction over it in Delaware would offend due process.

1. Section 3104(c)(3): Specific Jurisdiction

If the prerequisites of subsection (c)(3) are met, the Court may exercise specific jurisdiction over the defendant. *See LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del.1986). The fundamental inquiry in determining whether specific jurisdiction over a defendant exists is an analysis of the relationship among the defendant, the litigation, and the forum. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 1872 & n. 8, 80 L.Ed.2d 404 (1984); *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir.1990).

By its terms, subsection (c)(3) only applies when the defendant, or an agent of the defendant, performs some act (or omission) in the State of Delaware. *Cf. United States v. Consolidated Rail Corp.*, 674 F.Supp. 138, 142 (D.Del.1987);[5] *see also Uresil Corp. v. Cook Group Inc.*, 1988 WL 124335 at 2 (N.D.Ill. Nov. 15, 1988) ("A defendant who has participated in a transaction must actually have done something, however slight, in Illinois in order for his actions to fall under the statute."). To read the "act in Delaware" requirement out of subsection (c)(3) would eliminate the distinction between subsection (c)(3) and subsection (c)(4). *See Moore v. Little Great Indus., Inc.*, 513 F.Supp. 1043, 1046 (D.Del.1981), *aff'd*, 681 F.2d 807 (3d Cir. 1982). Roebuck does not allege that PLC has done any act in Delaware with relation to the sale of ADRs. Indeed, Roebuck does not even allege that a PLC ADR has ever been bought, sold, or traveled through Delaware. The ADRs do not provide a basis for jurisdiction under subsection (c)(3). *See Williams v. Canon, Inc.*, 432 F.Supp. 376, 381 (C.D.Calif.1977).

It is clear, on the other hand, that under Delaware law a corporation that causes the incorporation of a subsidiary in Delaware performs an act within Delaware. In *Papendick v. Bosch*, 410 A.2d 148 (Del.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980), a contract case, the Delaware Supreme Court concluded that the act of incorporation could create a significant relationship among the parent corporation, Delaware, and the litigation, and thus confer specific jurisdiction over the parent corporation. The court reasoned:

> RB came into the State of Delaware to create, under the Delaware Corporation law, a subsidiary corporation for the purpose of implementing its contract with B–W and accomplishing its acquisition of B–W stock. RB utilized the benefits and advantages of Delaware's Corporation Law for the creation of RBNA.... It is reasonable to assume that RB saw benefits and advantages in purposefully selecting the State of Delaware and utilizing its laws, above all others, for the creation of RBNA in the execution of its agreement with B–W. We conclude that RB's ownership of RBNA stock was the result of RB's purposeful activity in Delaware as an integral component of its

5. This segment of *Conrail* pertains to Section 3104(c)(1). Like subsection (c)(3), subsection (c)(1) confers specific jurisdiction and the factors examined in each analysis are the same.

total transaction with B–W to which the plaintiff's instant cause of action relates.

Accordingly, the court concluded:

> We do not believe that the *International Shoe [Corporation v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1946)]* "minimum contact" due process standards were intended to deprive Delaware courts of jurisdiction by permitting an alien corporation to come into this state to create a Delaware corporate subsidiary ... under the protection of and pursuant to the powers granted by the laws of Delaware, and then be heard to say, in a suit arising from the very contract which the subsidiary was created to implement, that the only contact between it and Delaware is the "mere" ownership of stock of the subsidiary.... There is a controlling distinction, for present purposes, between the ownership of shares of stock acquired by purchase or grant as in *Shaffer [v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)] on the one hand, and ownership arising from the purposeful utilization of the benefits and protections of the Delaware Corporation Law in activities related to the underlying cause of action, on the other hand. [The defendant] purposefully availed itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action. Therein lies the "minimum contact" sufficient to sustain the jurisdiction of Delaware's courts....

*Id.* at 152. Similarly, Delaware has found specific jurisdiction to exist over a parent corporation when it incorporates a subsidiary in Delaware to effectuate a merger, and that merger lies at the heart of the law suit. *See Rabkin v. Philip A. Hunt Chemical Corp.,* 547 A.2d 963, 966 (Del.Ch.1986). In *Sternberg v. O'Neil,* 550 A.2d 1105, 1120–21 (Del.1988), the Delaware Supreme Court applied *Papendick* to a derivative action to find the existence of personal jurisdiction. Further, the *Sternberg* Court found the *Papendick* rationale to be in accord with Supreme Court doctrine that requires some act by which the defendant

purposefully avails himself of the benefits of the forum.

> The *Burger King Corp. [v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)]* rationale is entirely consistent with our holding in *Papendick* that the creation of a Delaware subsidiary is such an act. *Burger King Corp.* supports our conclusion in *Papendick* that a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play.

*Id.* at 1121.

■ This Court finds no reason to depart from the Delaware Supreme Court's interpretation of its own corporate law. Neither can this Court fault the constitutional analysis of *Sternberg.* Accordingly, by incorporating a subsidiary in Delaware, namely DMH, PLC performed an act in state sufficient to confer personal jurisdiction over it for causes of action related to that act of incorporation. Incorporating a subsidiary is also sufficient to satisfy due process for the Court to exercise jurisdiction over claims arising out of that act, because it shows that PLC "purposefully directed its activity" toward the State of Delaware to avail itself of Delaware's laws. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2181; *see id.* at 476, 105 S.Ct. at 2184. Accordingly, in assessing the relationship among PLC, Delaware, and PLC's subsidiaries' use of the name "Sears," *see Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984); *Shaffer v. Heitner,* 433 U.S. 186, 203, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977), the Court finds that PLC has sufficient minimum contacts with Delaware to assert specific jurisdiction over it. *See World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958); *International Shoe Corp. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

2. Section 3104(c)(4): General Jurisdiction

As interpreted by the Delaware Supreme Court, subsection (c)(4) confers general jurisdiction over a defendant who meets that section's prerequisites. *See LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del.1986); *accord United States v. Consolidated Rail Corp. ("Conrail")*, 674 F.Supp. 138, 143 & 144 (D.Del.1987). The United States Supreme Court defined general jurisdiction in *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 & n. 9, 104 S.Ct. 1868, 1872 & n. 9, 80 L.Ed.2d 404 (1984): "When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant."

In order to assert general jurisdiction, the defendant's activity in the forum must be continuous and substantial. *See International Shoe Co. v. Washington*, 326 U.S. 310, 317, 66 S.Ct. 154, 158; *Dollar Savings Bank v. First Security Bank of Utah*, 746 F.2d 208, 212 (3d Cir.1984); *United States v. Conrail*, 674 F.Supp. at 145. In *International Shoe*, the Supreme Court indicated that the "continuous and substantial" requirement is not often met: "There have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159. Indeed, there appears to be only one case, *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), in which the United States Supreme Court has upheld the exercise of personal jurisdiction over a defendant where the claim was not related to the defendant's forum related activities. *See United States v. Conrail*, 674 F.Supp. at 145; *Magid v. Marcal Paper Mills*, 517 F.Supp. 1125, 1131 n. 5 (D.Del.1981).[6] Ac-

cordingly, the standard for general jurisdiction is "a high standard in practice," *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir.1986); *accord Newport Components, Inc. v. NEC Home Electronics (U.S.A.), Inc.*, 671 F.Supp. 1525, 1533 (C.D.Cal.1987).

■ PLC's alleged contacts with Delaware are the owning and incorporation of DMH, the availability of ADR's in Delaware, and the fact that PLC's stock price is quoted in the Wall Street Journal. As noted above, PLC's act of incorporating DMH is an act of PLC, in Delaware, sufficient to confer specific jurisdiction over PLC for causes of action arising out of that act. For this Court to attribute DMH's general presence in Delaware to PLC, however, a more extended inquiry is required.

In *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260 (D.Del.1989), this Court discussed two theories by which the acts or presence of a subsidiary could be imputed to a parent corporation under Delaware law: a finding that the subsidiary was the alter-ego of the parent, *see id.* at 265–71, or a finding that the subsidiary was the agent of the parent. *See id.* at 271–72.

In order to reach a parent corporation under the alter-ego theory, the plaintiff must show fraud, injustice, or inequity in the use of the corporate form. *See id.* at 267, 268–69 (citing *United States v. Van Diviner*, 822 F.2d 960, 964–65 (10th Cir. 1987) (applying federal common law); *American Bell Inc. v. Federation of Tel. Workers of Pa.*, 736 F.2d 879, 886 (3d Cir. 1984) (federal law); *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981) (federal law); *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir.1979) (federal law); *Laborers' Pension Fund v. Litgen*, 709 F.Supp. at 143 (federal law); *Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del.1968) (Delaware law); *Mabon, Nugent & Co. v. Texas American Energy Corp.*, [1987–1988

---

**6.** In *Perkins,* the president of a Philippine mining company operated the corporation in the

forum state during World War II.

Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,674, at p. 98,092, 1988 WL 5492 (Del.Ch. Jan. 27, 1988) (Delaware law); *Terry Apartments Associates v. Associated–East Mortgage Co.*, No. 4778, 3 Del.J. Corp.L. 560, 564–65, 1977 WL 2567 (Del.Ch. Jan. 31, 1977) (Delaware law); *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 32012, at 14 (Del.Super. March 30, 1988) (Delaware law)). Thus, the alleged fraud or inequity must be distinct from the tort alleged in the complaint. "Any breach of contract and any tort—such as patent infringement—is, in some sense, an injustice.... The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *Id.* at 268. There is no fraud or injustice in PLC's use of the corporate form. PLC chose to incorporate in Delaware, after it discovered Delaware offered tax advantages *vis-a-vis* Tennessee. The desire to take advantage of Delaware tax law does not "*evidence fraudulent intent in forming the corporation,*" and is insufficient to hold PLC present in Delaware under the alter-ego theory. *Id.* at 269 (quoting *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1113 (9th Cir.1979)). It is only the exceptional case where a court will disregard the corporate form, *see id.* at 270–71 (citing cases), and Roebuck has not carried the burden of showing substantial reasons for doing so in this case.

■ The agency theory does not require a finding of fraud, or even a parent-subsidiary relationship. *See id.* at 271. However, "a vital prerequisite to imposing liability based upon customary agency principles is finding a close connection between the relationship of the two corporations and the cause of action." *Id.* at 271. Implicitly, the scope of jurisdiction under the agency theory will be defined by the scope of the authority delegated to the agent. *See Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 422–24 (9th Cir.1977). Here, Roebuck wishes to assert general jurisdiction over PLC on the theory that DMH was PLC's agent. To do so, Roebuck must show that DMH was PLC's general agent in Delaware.

The only evidence in the record on the scope of DMH's authority as an agent of PLC are PLC's policies concerning the use of the name "Sears." As the chairman of PLC stated, PLC authorizes its subsidiaries to use the name "Sears." Further, it was pursuant to PLC's instructions that DMH was originally incorporated under the name "Sears, Inc." This record falls far short of establishing DMH as PLC's general agent in Delaware. There is no evidence that DMH could enter into negotiations or binding agreements for PLC, or act for PLC in any other way in Delaware. The Court concludes that Roebuck has failed to show, under either the alter-ego or agency theories, that DMH's presence in Delaware establishes the substantial activity required before general jurisdiction may be asserted over PLC.

Three District of Delaware cases discussed by the parties are not to the contrary. In *Afros S.p.A. v. Kraus–Maffei Corp.*, 624 F.Supp. 464 (D.Del.1985), the parent owned 100% of its subsidiaries' stock. After a suit for patent infringement was filed against the parent, the parent assigned the allegedly infringing patent to its subsidiary. The Chief Executive Office of the subsidiary did not know of the assignment. The Court held that personal jurisdiction did not lie because the parent had "*no* direct contact with Delaware; its only ascertainable 'contact' is through its subsidiary...." *Id.* at 468. In *Afros*, unlike the present case, the parent's act of incorporating the subsidiary did not give rise to the alleged tort. Here, PLC did have direct contact with Delaware, for specific jurisdictional purposes, when its act of incorporating DMH using the name "Sears" is the very act Roebuck alleges gives rise to liability.

The Court in *Akzona Inc. v. E.I. Dupont de Nemours & Co.*, 607 F.Supp. 227 (D.Del. 1984), did not distinguish the agency and alter-ego theories. However, it did find that absent *total* control of the subsidiary, evidenced by interference in the day-to-day operations of the subsidiary, the presence

of the subsidiary could not be imputed to the parent for jurisdictional purposes. *See id.* at 237, 238 ("[The plaintiff] has not established that [the defendant] interferes in the day-to-day operations of its subsidiaries but only that it oversees and approves major capital expenditures."). Roebuck has established that PLC oversees major policy decisions of DMH, such as the sale of the Butler Group, but has failed to show the pervasive interference with DMH required by the analysis in *Akzona.*

Finally, in *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53 (D.Del.1982), the Court found it had both specific and general jurisdiction over the defendant parent corporation. Specific jurisdiction was found under an agency theory. As with PLC and DMH, the parent corporation in *Altech* "directed and controlled" its subsidiary in the accomplishment of one act: "infringing plaintiff's trade name." *Altech,* 542 F.Supp. at 55.[7] General jurisdiction was established in *Altech* because of the parent corporation's substantial connections with Delaware. "A vast majority" of the parent corporation's 82 subsidiaries were incorporated in Delaware. *Id.* at 55. In the seven year period immediately preceding the *Altech* decision, the parent corporation "incorporated at last [sic] 35 subsidiaries in Delaware and amended the certificates of at least 5 others changing either their business purpose of [sic] corporate names." *Id.* By considering "[t]hese activities ... in their totality," the Court concluded that the parent corporation's activity in Delaware met the due process requirement of substantial and persistent. *Id.* at 56.

■ The totality of PLC's activities in Delaware are not as substantial. While personal jurisdiction analysis is not based on a minimum number of quantifiable acts attributable to the defendant, there is a clear difference between PLC's owning and

incorporation of one subsidiary, and the *Altech* defendant's 82.[8] Owning one subsidiary, where that subsidiary is not the alter-ego or general agent of the parent corporation, is not sufficient to establish substantial activities in the forum. Because DMH's presence in Delaware can only be marginally attributed to PLC, DMH's presence does not support a finding that PLC had substantial contacts with Delaware.

As under the analysis for specific jurisdiction, the ADRs and the stock quotes in the Wall Street Journal do not link PLC to this forum. Even were the stock quotes considered "national advertising," they fall short of the "sustained promotional campaign" required by the Third Circuit to establish forum based contacts. *See Max Daetwyler,* 762 F.2d at 300; *accord Wines,* 846 F.2d at 43; *Ameritec,* 1986 WL 20702 at 6. A national offering of ADRs also does not connect PLC with Delaware. *See Consolidated Gold Fields v. Anglo American Corp.,* 698 F.Supp. 487, 494 (S.D.N.Y. 1988) (permitting the sale of unsponsored ADRs does not confer general jurisdiction); *Cf. Omni Exploration, Inc. v. Graham Eng'g Corp.,* 562 F.Supp. 449, 455 (E.D.Pa. 1983) ("there has been no evidence presented to show that such act of issuing stock is a sufficiently substantial and continuous forum affiliation to subject ... [the defendant] to this court's jurisdiction.").

### 3. Jurisdictional Conclusions

As noted at the outset of the jurisdictional discussion, this Court must look to both the Delaware long-arm statute and the federal constitution when determining whether and to what extent it may exercise personal jurisdiction over a defendant. As in *Max Daetwyler,* the Delaware "statute by its terms contemplates that personal jurisdiction shall be based solely upon contacts

---

**7.** The Court finds that specific jurisdiction over PLC may also be predicated under this limited agency theory.

**8.** Roebuck does contend that the incorporation in Delaware of up to twelve other companies should be attributed to PLC. *See* D.I. 238 at 7–8. All of these corporations are either owned

by DMH or a subsidiary of DMH. *See* D.I. 250 at Ex. F. Because there is no basis for disregarding DMH as a corporate entity, *see discussion supra,* neither the incorporation nor the operation of these companies may be attributed to PLC.

with the state." 762 F.2d at 296 n. 8. The Court is not "free to disregard those aspects of state law, which do not seem to accord with the pursuit of a federal claim, without usurping the prerogative of Congress." *Id.* Absent general jurisdiction over a defendant, each claim brought by a plaintiff must be supported by independent acts of the defendant that establish sufficient minimum contacts among the defendant, the forum and that claim. *See Club Assistance Program, Inc. v. Zuckerman,* 594 F.Supp. 341, 345 (N.D.Ill.1984); *accord Wolf Point Venture, Ltd. v. Associated Lenders Financial Corp.,* 1988 WL 56249 at 1 (N.D.Ill. May 20, 1988); *LaScola v. U.S. Sprint Communications,* 1988 WL 19656 at 3 (N.D.Ill. Feb. 26, 1988); *Hyatt Corp. v. Club Regency International, S.A.,* 1986 WL 8029 at 11 (N.D.Ill. Jul. 14, 1986); *McHugh v. Blumenfeld,* 1985 WL 2722 at 1–2 (N.D.Ill. Sept. 27, 1985).[9]

In Section III.A.1. above, it was determined that there were sufficient contacts to assert personal jurisdiction over the claims arising out of PLC's incorporation of DMH. However, the Court also determined that there were insufficient contacts among PLC, Delaware, and Roebuck's ADR claims for this Court to assert specific jurisdiction over those claims. Nor do the ADR claims "lie in the wake" of PLC's act of incorporating a subsidiary in Delaware, *Club Assistance Program, Inc.,* 594 F.Supp. at 346; *LaScola,* 1988 WL 19656 at 3, despite the fact that both claims allege trademark and trade name infringement. The Illinois court's terminology of "lying in the wake" is related to the phrase "under the circumstances" in Federal Rule 4(e). "[T]he word 'circumstances' does not refer to the *nature of the claim* but rather to the *nature of the acts* giving rise to the claim." *Max Daetwyler,* 762 F.2d at 295–96 n. 7 (emphasis added). The acts connecting the incorporation of a subsidiary to the State of Delaware are unrelated to the acts taken by banks in New York to sell PLC ADRs.

■ Simply put, Roebuck has alleged two torts occurring in two separate fora. Because *Max Daetwyler* prevents this Court from considering PLC's nationwide contacts in a jurisdictional analysis, 762 F.2d at 291; *accord Dent v. Cunningham,* 786 F.2d 173, 175 (3d Cir.1986), the finding of specific personal jurisdiction over one tort does not confer specific jurisdiction over the other tort. The *Max Daetwyler* court noted that Rule 4(e)'s requirement that federal courts look to state long-arm statutes "leads to the prospect of a federal court refusing to adjudicate a federal claim because the courts of the state in which it sits could not accept jurisdiction." *Id.* at 296. Were a Delaware court presented with the ADR claims alone, it would not be able to assert personal jurisdiction over PLC. Consequently, this Court cannot assert jurisdiction over the ADR claims.

Indeed, where general jurisdiction over a defendant is lacking, the constitutional analysis distinguishing between general and specific jurisdiction would become meaningless if the finding of specific jurisdiction over one claim provided the basis for extending jurisdiction over all other alleged claims. To permit that type of bootstrapping would undermine the foreseeability requirement that the Third Circuit deemed "dispositive" in the Supreme Court's *World–Wide Volkswagen* decision, *Max Daetwyler,* 762 F.2d at 295 n. 6 and accompanying text:

> individuals should be given fair notice about which activities would make them amenable to suit in a state forum.... [T]hat foreseeability which is of constitutional significance is not the mere likelihood that a product will enter the United States, but rather that Meyer, by shipping his product to various areas of this nation, should reasonably anticipate being haled into court in Pennsylvania, despite the insufficiency of his contacts with that particular forum.

*Id.* Absent general jurisdiction over PLC in Delaware, PLC could not reasonably an-

---

9. *Delaware looks to Illinois for guidance in interpreting its own long-arm statute. See supra* note 3.

ticipate being haled into a court in Delaware for the acts it undertook relating to the ADR program because not one of those acts had any connection to Delaware. Accordingly, the ADR claims must be dismissed. *Cf. Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 544–45 (3d Cir.1985) (dismissing negligence and breach of contract claims for lack of personal jurisdiction and finding personal jurisdiction established for fraudulent misrepresentation and intentional infliction of emotional distress claims).

## IV. MOTIONS FOR SUMMARY JUDGMENT

PLC has moved for summary judgment on Roebuck's claims concerning: (1) the ADRs;[10] (2) the activities of five PLC subsidiaries;[11] and (3) the mootness of claims relating to six PLC subsidiaries.[12] Roebuck has moved for partial summary judgment to dismiss PLC's unclean hands defense.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To resist a motion for summary judgment, the non-moving party must come forward with sufficient specific facts to establish a genuine factual issue for trial. "Where the full record, taken together, could not lead a rational trier of fact to find for the non-moving party, no genuine issue exists for trial." *United States v. One 107.9 Acre Parcel of Land*, 898 F.2d 396, 398 (3d Cir. 1990) (relying on *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The Court notes, however, that it is the moving

parties' burden to "prov[e] that no genuine issues exist as to any material fact," *Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30, 35 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)), and that all ambiguities and reasonable inferences must be resolved in favor of the non-moving party. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976); *Wilmington Housing Authority v. pan Builders, Inc.*, 665 F.Supp. 351, 351 (D.Del. 1987).

### A. PLC's Claim Of Mootness

In the Third Circuit, " '[a]n action becomes moot when "(1) there is no reasonable expectation that the alleged events will recur … and (2) interim relief or events have completely eradicated the effects of the violation." ' " *Zellous v. Broadhead Associates*, 906 F.2d 94, 100 (3d Cir.1990) (quoting *Ames v. Westinghouse Elec. Corp.*, 864 F.2d 289, 291–92 (3d Cir. 1988), and *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), and *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 896, 97 L.Ed. 1303 (1953)). PLC's argument focuses on the fact that two corporations are no longer subsidiaries of PLC,[13] that both E.P. Securities, Inc. and DMH have entered binding consent decrees preventing them, or their subsidiaries from using the word "Sears," and the fact that two corporations are dormant and engage in no business activities.[14]

■ PLC's argument is persuasive with regard to the second prong of the mootness analysis, but fails to satisfy the first prong. The basis of PLC's contention is that it can disassociate itself, in all cases, from its subsidiaries' use of the word "Sears."

---

10. PLC's motion concerning the ADRs has been resolved on jurisdictional grounds.

11. The five subsidiaries are: Millets Leisure Limited, Portman Limited, Selfridges Limited, British Shoe Corporation, and Sears Financial Services Limited, all non-Delaware companies.

12. These six subsidiaries are: William Hill Organization Limited, The Butler Group, Inc.,

Sears Exploration and Development Limited, The Marcus Company, Inc. (all of which are former or dormant corporations), E.P. Securities, Inc., and DMH.

13. Namely, the Butler Group, Inc. and the William Hill Organization.

14. Sears Exploration and Development Limited and The Marcus Company, Inc.

PLC mischaracterizes the nature of Roebuck's claim, because under Delaware law when a parent corporation causes the incorporation of a subsidiary, the act of incorporation is an act attributable to the parent. *See* discussion at Section III.A.1. *supra.* Further, a subsidiary may act as an agent of a parent. In this case, a material fact in dispute is whether PLC's subsidiaries were agents of PLC with regard to the use of the name "Sears." *See id.* Accordingly, the first prong's reasonable expectation of recurrence inquiry focuses on the policies and acts of PLC, not PLC's subsidiaries. Significantly, PLC has not disavowed rights to the use of the word "Sears" in the United States, *see* D.I. 246A at 189–92,[15] where Roebuck claims it alone may use the word. Additionally, PLC has adopted a policy of incorporating or "changing the names of dormant companies to Sears Companies...." D.I. 238A at A39. These two facts, combined with PLC's activities in implementing its corporate policy, force this Court to conclude that there is a material issue in dispute as to whether Roebuck has a reasonable expectation that an allegedly trademark or trade name infringing act will recur. Thus, the Court denies PLC's motion for summary judgment based on mootness.

### B. *PLC's Motion Concerning Its Subsidiaries* [16]

■ The parties' debate on the issue of whether PLC may be held liable for the allegedly infringing activity of its subsidiaries, *see supra* note 12, focused primarily on whether there exists an agency relationship between PLC and its subsidiaries concerning the use of the name "Sears." The Court concludes that Roebuck has met its burden of showing that a material fact is in dispute. The statement of PLC's chairman that "while Sears plc has the ability to prevent a subsidiary from using the 'Sears' name, in practice it would not do so," D.I. 238A at 28–29, indicates that PLC has retained control over the use of the name "Sears." The extent of this control, and whether that control creates an agency relationship, involves disputed facts that are inappropriate for resolution in a motion for summary judgment. *Cf. supra* note 7 and accompanying text (holding that DMH was a limited agent of PLC in Delaware). There being a material issue of fact in dispute, PLC's motion for summary judgment based on the activities of its subsidiaries will be denied.[17]

### C. *Roebuck's Motion Concerning PLC's "Unclean Hands" Defense*

■ The basis of the unclean hands "defense" is the "equitable principle that '[n]o court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.'" *American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania,* 736 F.2d 879, 886 (3d Cir.1984) (citation omitted). In actuality, a defendant's claim of unclean hands on the part of a plaintiff is not a defense at all. When presented with a claim of unclean hands, the court is primarily concerned with protecting its own integrity, and in not abetting the inequitable conduct of a plaintiff with respect to the matter in litigation. *See Northeast Women's Center v. McMonagle,* 868 F.2d 1342, 1354 (3d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989); *Monsanto Co. v. Rohm & Haas Co.,* 456 F.2d 592, 598–99 (3d Cir. 1972); *Gaudiosi v. Mellon,* 269 F.2d 873, 881–82 (3d Cir.1959).

PLC's unclean hands defense is based on the totality of three sets of facts. First, PLC alleges that Roebuck has brought its infringement claims inequitably because Roebuck's actual motive is not to vindicate

---

**15.** PLC does not state outright that it plans to use the name "Sears" in the United States. However, the answer to the interrogatory cited in the text strongly implies that PLC will use "Sears" in its efforts to raise capital here.

**16.** The parties have discussed the question of whether English or Delaware law applies. Both Roebuck and PLC conclude that there is no substantial difference between the two. *See* D.I. 225 at 29; D.I. 246 at 19 n. 7.

**17.** While the parties have not argued it, under the law of the case as established above, it is unclear that this Court has personal jurisdiction over PLC for the acts of its non-Delaware subsidiaries.

its right in the United States, but to affect the parties' rights in the United Kingdom. Second, PLC contends that Roebuck has "acted inconsistently and inequitably with regard to defendants and its effort to obtain relief at this time is time barred by the doctrine of unclean hands." D.I. 243 at 29. PLC's final unclean hands argument is that Roebuck has "acted inequitably with regard to confusion." *Id.* at 30.

With regard to its first contention, PLC argues that the unclean hands inquiry is inappropriate for summary judgment because it involves the intent of the plaintiff in bringing the lawsuit and the manner in which Roebuck has conducted settlement discussions. To support its contention, PLC cites cases to the effect that "bad intent is the essence of the defense." *Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 308 (9th Cir.1982); *see also Jenn–Air Corp. v. Modern Maid Co.*, 499 F.Supp. 320, 333–34 (D.Del.1980), *aff'd*, 659 F.2d 1068 (3d Cir.1981); *AM Int'l, Inc. v. Eastman Kodak Co.*, 577 F.Supp. 1117, 1122–26 (N.D.Ill.1983). However, in each case cited the relevant intent was the intent the plaintiff had in procuring or using the right that was the subject matter of the litigation. *See also Monsanto Co.*, 456 F.2d at 599–600 (no bad intent in patent application); *Gaudiosi*, 269 F.2d at 881–82 (bad intent in pre-litigation conduct of the plaintiff bars suit). For example, in *Wells Fargo*, the intent the court discussed was the intent of the defendant in choosing its trademark, not the intent in bringing its suit. The only decision discussed by the parties that addressed the question of the plaintiff's intent in bringing suit was *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327 (2d Cir.1983). There, the Second Circuit upheld the dismissal of an unclean hands defense because the plaintiff's claim was not wholly baseless; the plaintiff had copyright registration for the intellectual property contested. *See id.* at 334. In the matter at hand, PLC does not claim that Roebuck's infringement claim is baseless.[18] Further, the unclean hands

claim requires of a plaintiff "fair dealing and righteous conduct with reference to matters concerning which they seek relief." *Monsanto Co. v. Rhom & Haas Co.*, 456 F.2d 592 at 599 n. 11 (quoting 1 Story's *Equity Jurisprudence* § 99 (14th ed.)). While bringing a lawsuit brings the contested issue before the court, the act of bringing suit is not, itself, the matter concerning which a plaintiff seeks relief. Thus, the Court must focus on alleged inequitable conduct in the gaining or the use of the right being contested, not alleged inequitable conduct in the bringing of the lawsuit. Accordingly, PLC cannot maintain a claim of unclean hands based on Roebuck's alleged intent in bringing this action as based on Roebuck's alleged litigation strategy.

With regard to PLC's second basis for unclean hands, it may be possible for PLC to show that because of its dealings with a PLC subsidiary it is inequitable for Roebuck to allege trademark or trade name infringement now. Roebuck had an extended business relationship with a PLC subsidiary, Sears Industries, Inc., involving $39.3 million in business. *See* D.I. 243 at Ex. G (Hartley affidavit at p. 55). Similarly, PLC contends that Roebuck suffers a number of United States corporations to use the word "Sears." *See* D.I. 48 at Ex. A. These claims allege inequitable conduct in the use of the right that is the subject matter of the present litigation, and are, accordingly, proper bases for the claim of unclean hands.

Roebuck contends that PLC is foreclosed from making this argument as "unclean hands" because it duplicates the contentions of its separately pleaded "estoppel by laches defense." *See* D.I. 221 at 10 n. 7. Roebuck, however, has not offered any grounds for concluding that two defenses cannot be supported by the same factual predicates. Roebuck's motion for partial summary judgment will be granted in part.

---

**18.** The Court does not hold that a mere showing that a claim is baseless is sufficient to support a claim of "unclean hands," absent a showing of inequitable conduct in the use or procurement of the right being litigated.

## V. CONCLUSION

PLC's motion to dismiss for lack of personal jurisdiction will be granted only with respect to Roebuck's claims concerning PLC American Depositary Receipts, and will be denied with respect to the incorporation of DMH. Accordingly, the Court does not reach PLC's motion for summary judgment on the ADRs. PLC's motions for summary judgment on the activities of its five subsidiaries, and its motion for summary judgment based on mootness, will both be denied. Roebuck's motion for summary judgment on PLC's claim of unclean hands will be granted only with respect to the bringing of the action and with respect to settlement negotiations. Concerning Roebuck's past use of its alleged trademark and trade name rights, summary judgment will be denied. An appropriate order follows.